IN RE SUNSET SALES, INC., doing business as K & R Coal Company, doing business as Sans Bois Coal Company, Reorganized Debtor.

David R. PAYNE, Liquidating Trustee, Plaintiff–Appellee,

v.

CLARENDON NATIONAL INSURANCE COMPANY, U.S. Capital Insurance Company, and Van American Insurance Company, Defendants–Third–Party Plaintiffs–Counter-Defendants–Appellants, Delta Contracting, Inc., and Roger Dahlgren, Defendants–Third–Party Defendants, First National Bank Of Edmond,Defendant–Third–Party Defendant–Counter-Claimant.

BAP No. WO–97–100.
Bankruptcy No. 92–16745–BH.
Adversary No. 95–1012–BH.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

June 4, 1998.

Submitted on the briefs: *

G. Patrick Garrett, Oklahoma City, OK, for Defendants–Appellants.

Lyle Stewart Vaughn and Karen Eby of Lyle S. Vaughn, P.C., Oklahoma City, OK, for Plaintiff–Appellee.

Before McFEELEY, Chief Judge, and PEARSON, and BOULDEN, Bankruptcy Judges.

## OPINION

BOULDEN, Bankruptcy Judge.

Clarendon National Insurance Company (Clarendon), U.S. Capital Insurance Company (U.S. Capital), and Van–American Insurance Company (Van–American) (collectively, the Appellants), appeal a judgment of the United States Bankruptcy Court for the Western District of Oklahoma in favor of David Payne, Liquidating Trustee (Trustee) for the estate of Sunset Sales, Inc., the reorganized Chapter 11 debtor (Debtor). The bankruptcy court's judgment allows the Trustee to recover approximately $146,000 from the Appellants as preferential transfers under 11 U.S.C. § 547(b).[1] The Appellants assert that the bankruptcy court committed error in determining that certain transfers were of property of the Debtor made on account of an antecedent debt owed by the

---

* After examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal, and therefore grants the Appellants' request for a decision on the briefs without oral argument. *See* Fed. R. Bankr.P. 8012; 10th Cir. BAP L.R. 8012–1(a). The case is therefore submitted without oral argument.

1. Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Debtor; that the Debtor was insolvent at the time of the transfers; and in rejecting the Appellants' contemporaneous exchange, new value, and ordinary course of business defenses. For the reasons set forth below, the bankruptcy court's judgment is AFFIRMED.

## I. BACKGROUND

### A. Procedural Background

K & R Coal Company (K & R) was an Oklahoma corporation engaged in the business of mining coal. On October 9, 1992, K & R, Evans Coal Sales Company (Evans), and Sunset Sales, Inc. were merged under Oklahoma law. The surviving corporation was named Sunset Sales, Inc. Five days later, on October 14, 1992, Sunset Sales, Inc. filed a petition seeking relief under Chapter 11 of the Bankruptcy Code and became the Debtor in this case. The Trustee was appointed as a Chapter 11 trustee three months after the petition was filed. In 1994, the bankruptcy court confirmed the Trustee's Second Amended Plan of Reorganization (Plan), which established a liquidating trust consisting of, *inter alia*, all causes of action for avoidable transfers belonging to the bankruptcy estate. The Trustee was named as the Liquidating Trustee under the Plan, and is the person with standing to prosecute avoidance actions on behalf of the estate.

Within two years of his appointment but more than two years after the Debtor's bankruptcy petition was filed, the Trustee filed a complaint against the Appellants seeking to recover certain transfers that had been made by K & R to the Appellants in the year preceding the filing of the Debtor's case under, in relevant part, §§ 547(b) and 548. The Appellants answered the Trustee's complaint, and filed third-party complaints asserting indemnity and contribution claims against First National Bank of Edmond (FNB), the issuer of certain letters of credit related to the transfers sought to be avoided, Roger Dahlgren (Dahlgren), an officer and shareholder of K & R, and Delta Contracting, Inc. (Delta), an affiliate of K & R. FNB also filed counterclaims against the Appellants.[2]

After a trial on the Trustee's complaint, the bankruptcy court entered its Findings of Fact and Conclusions of Law, concluding that the Appellants had received preferential transfers avoidable pursuant to § 547(b). It thereafter entered a separate judgment, awarding the Trustee $146,282, plus costs and interest. The Appellants timely filed a notice of appeal from the bankruptcy court's judgment.

### B. The Transfers Avoided by the Trustee

Prior to the filing of the Debtor's petition, K & R contracted with both Clarendon and U.S. Capital to obtain bonds as required under Oklahoma and federal law to assure reclamation of lands damaged by its mining operations. Under these agreements, K & R was required to make certain payments to the Appellants, which payments are the subject of the Trustee's avoidance action as described below.

#### 1. Clarendon Agreement and Transfers

Clarendon issues bonds required by governmental units for coal mining operations on non-federal leases. In May of 1991, Clarendon agreed to issue collateral bonds on behalf of K & R under a contract of indemnity that required K & R to pay annual premiums of 2% of the face amount of the bonds, with the first payment due when the bonds were issued (Premium Payments). The collateral for the bonds was cash based on 15% of the face amount of the bonds. One half of this collateral was to be paid by K & R when the bonds were issued, and the remainder was to be paid by it on a date not contained in the

**2.** Dahlgren demanded a jury trial and this adversary proceeding was transferred to the United States District Court for the Western District of Oklahoma (District Court). Thereafter the District Court denied the Trustee and the Appellants' cross-motions for summary judgement, and otherwise disposed of Appellants' claims against FNB, dismissed a third-party complaint against FNB, dismissed a third-party complaint against Dahlgren, and dismissed Delta from the case. The Appellants appealed, among others, District Court orders denying the Appellants' motion for summary judgment against the Trustee to the United States Court of Appeals for the Tenth Circuit. That appeal is still pending. The District Court then referred the adversary proceeding back to the bankruptcy court.

record out of tonnage of coal produced at a rate of $.30 per ton (Collateral Payments). Delta, a wholly owned subsidiary of K & R, was jointly and severally liable under this contract, and Dahlgren, K & R's sole shareholder and president, guaranteed the contract. K & R and Delta agreed to indemnify Clarendon for any loss it might suffer from the transaction.

In May of 1991, after the contract of indemnity was executed, Clarendon issued five bonds with a total face value of $645,600 on behalf of K & R and in favor of the State of Oklahoma (Clarendon Bonds). The annual Premium Payments on the Clarendon Bonds were in the total amount of $46,092, and the Collateral Payments were in the total amount of $96,840.

In July of 1992, fourteen months after the Clarendon Bonds were issued, K & R made Premium Payments in the amount of $500, $1,000, and $1,932 (Clarendon Premium Transfers). The bankruptcy court found that these Premium Payments were late payments for amounts due when the Clarendon Bonds were issued in May of 1991. There is some evidence in the record, however, to suggest that these Payments were annual payments made to renew the Clarendon Bonds.

By April of 1992, almost a year after the Clarendon Bonds were issued, K & R had not made any Collateral Payments on the Clarendon Bonds, including the one-half payment due when the Clarendon Bonds were issued. Apparently pursuant to a demand of Van–American, the servicing agent for Clarendon and U.S. Capital, K & R made two Collateral Payments to Van–American on the Clarendon Bonds as follows:

April, 1992: Collateral Payment by way of letter of credit No. 161 in the total amount of $10,000 issued by FNB on behalf of K & R in favor of Van–American. This letter of credit was secured by K & R granting FNB a security interest in K & R's certificate of deposit in the amount of $10,000.

September, 1992: Collateral Payment by way of letter of credit No. 166 in the total amount of $30,000 issued by FNB on behalf of K & R in favor of Van–

American. This letter of credit was secured by K & R granting FNB a security interest in K & R's certificate of deposit in the amount of $30,000.

(collectively, the Clarendon Collateral Transfers). The $40,000 Clarendon Collateral Transfers did not exceed $96,840, the total Collateral Payments that were due during the first year that the Clarendon Bonds were issued. Moreover, the Clarendon Collateral Transfers did not exceed $48,420, one half of the annual Collateral Payment that was due at the time that the Clarendon Bonds were issued in May of 1991.

In May, July, and October of 1992, Clarendon issued three additional bonds on behalf of K & R in favor of the State of Oklahoma with a total face value of $276,500 (Clarendon Additional Bonds). Apparently, these Bonds were not collateral bonds. Although payments were made on the Clarendon Additional Bonds, these payments are not the subject of the Trustee's avoidance action.

### 2. *U.S. Capital Agreement and Transfers*

U.S. Capital issues bonds required by governmental units for coal mining operations on federal leases. In October of 1991, U.S. Capital agreed to issue collateral bonds on behalf of K & R, Delta, and Evans under a contract of indemnity that required K & R to pay annual premiums of 2% of the face amount of the bonds, with the first payment due when the bonds were issued (Premium Payments). The collateral for the bonds was cash based on 15% of the face amount of the bonds. One half of this collateral was to be paid by K & R when the bonds were issued, and the remainder was to be paid by it on a date not contained in the record out of tonnage of coal produced at a rate of $.30 per ton (Collateral Payment). Delta, a wholly owned subsidiary of K & R, was a co-obligor under this contract. The bankruptcy court also found that Dahlgren guaranteed the contract, although we do not find support for this finding in the record before us. K & R, Delta, and Evans agreed to indemnify Clarendon for any loss it might suffer from the transaction.

In November of 1991, after the contract of indemnity was executed, U.S. Capital issued eleven bonds for K & R and/or Delta and Evans in favor of the United States Department of the Interior, United States Office of Surface Mining Reclamation and Enforcement with a total face amount of $605,000 (U.S. Capital Bonds). The annual Premium Payments on the U.S. Capital Bonds were in the total amount of $12,100, and the Collateral Payments were in the total amount of $90,750.

In January of 1992, K & R made two Premium Payments to Van–American related to the U.S. Capital Bonds in the amounts of $5,900 and $6,200 (U.S. Capital Premium Transfers). In April of 1992, five months after the U.S. Capital Bonds were issued, K & R made a Collateral Payment by way of letter of credit No. 160 issued by FNB on behalf of K & R in favor of Van–American in the amount of $90,750. This letter of credit was secured by K & R granting FNB a security interest in K & R's certificate of deposit in the amount of $90,750 (U.S. Capital Collateral Transfer).

### 3. *Relevant Postpetition Facts*

After the Debtor filed Chapter 11, Van–American called the two letters of credit issued by FNB related to K & R's Collateral Payments on the Clarendon Bonds, and the letter of credit issued by FNB related to K & R's Collateral Payment on the U.S. Capital Bonds. FNB paid the face amount of those letters of credit in the total amount of $130,750 to Van–American. Pursuant to a stipulation with the Trustee and with leave of the bankruptcy court, FNB then foreclosed on the certificates of deposit that secured the letters of credit.

The State of Oklahoma has declared the Clarendon Bonds and the U.S. Capital Bonds in default, and it has demanded payment from the Appellants in the approximate amount of $600,000. The Appellants have refused to pay the State of Oklahoma under the Bonds.

3. References to "reclamation claims" herein refer to the Debtor's liability for restoring the land effected by its strip mining operations, and not to claims of creditors pursuant to U.C.C. § 2–702.

Clarendon filed a proof of claim in the Debtor's bankruptcy case seeking payment of a general unsecured claim in the amount of $701,000. U.S. Capital also filed a proof of claim, seeking payment of a general unsecured claim in the amount of $922,100. Both of these claims reflect reductions for the amounts that Van–American received from FNB under the respective letters of credit.

There are approximately $7 million in claims against the Debtor, and due to large administrative environmental reclamation claims,[3] unsecured creditors will receive no payment on their claims. Despite reasonable efforts by the Trustee, he has been unable to locate an entity to purchase the Debtor as a going concern.

### II. *APPELLATE JURISDICTION*

This Court, with the consent of the parties, has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1). Under this standard, we have jurisdiction over this appeal. The parties have consented to this Court's jurisdiction in that they have not opted to have the appeal heard by the United States District Court for the Western District of Oklahoma. *Id.* at § 158(c); 10th Cir. BAP L.R. 8001–1(a) and (d). The appeal was filed timely by the Appellants, and the bankruptcy court's judgment is "final" within the meaning of § 158(a)(1). *See* Fed. R. Bankr.P. 8001–8002.

We also conclude that this action is not time-barred under former § 546(a)(1). The statute of limitations set forth in § 546(a) was not raised by the parties at any stage of litigation in this case, and was not addressed by the bankruptcy court below. Despite this fact, we are compelled to consider whether it applies because the Tenth Circuit has suggested that § 546(a) may be jurisdictional and, therefore, cannot be waived by the parties. *Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 822 (10th Cir.1995).[4]

4. The court gave conflicting indications as to the jurisdictional nature of § 546(a). *Compare* 72 F.3d at 821 (the parties could seek an order extending the deadlines set forth in § 546(a)),

Former § 546(a), which is applicable to this case commenced prior to October 22, 1994, stated that a proceeding under §§ 547(b) and 548 could not be commenced after, in relevant part, "two years after the appointment of a trustee under section ... 1104." 11 U.S.C. § 546(a) (amended 1994). In *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990), the court held that the two-year period under § 546(a) applies to debtors in possession and, therefore, begins to run on the petition date. Under *Zilkha* it is therefore arguable that this proceeding is time-barred under former § 546(a) because it was commenced more than two years after the date that the Debtor filed bankruptcy.

■ We note, however, that in *Zilkha* the court expressly declined to rule on the issue before us of whether actions commenced by a Chapter 11 trustee within two years of its appointment are time-barred under former § 546(a). *Id.* at 1524 n. 11. Although never definitively decided by the Tenth Circuit, the court, in rather strong *dicta* in *Starzynski,* 72 F.3d at 821, indicated that if a trustee is appointed in a Chapter 11 case, the trustee would have two years from that appointment in which to file actions. Based on this direction from the Tenth Circuit, we conclude that the two-year period under former § 546(a) recommenced upon the appointment of the Trustee. Thus, this proceeding is not time-barred as it was commenced by the Trustee within two years of his appointment.

### III. *STANDARD OF REVIEW*

"For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo* ), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 2546, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1370 (10th Cir.1996). *De novo* review re-

quires an independent determination of the issues, giving no special weight to the bankruptcy court's decision. *Salve Regina College v. Russell,* 499 U.S. 225, 238, 111 S.Ct. 1217, 1224–25, 113 L.Ed.2d 190 (1991).

A factual finding is "clearly erroneous" when " 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.' " *Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182, 1185 (10th Cir.1990) (quoting *LeMaire By and Through LeMaire v. United States,* 826 F.2d 949, 953 (10th Cir.1987)). In reviewing findings of fact, we are compelled to give due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed. R. Bankr.P. 8013.

"Under the abuse of discretion standard[,] 'a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.' " *Moothart v. Bell,* 21 F.3d 1499, 1504 (10th Cir.1994) (quoting *McEwen v. City of Norman,* 926 F.2d 1539, 1553–54 (10th Cir.1991)). As with the clearly erroneous standard, when applying the abuse of discretion standard, deference is given to the bankruptcy court " 'because of its first-hand ability to view the witness or evidence and assess credibility and probative value.' " *Id.* (quoting *McEwen,* 926 F.2d at 1553–54).

### IV. *DISCUSSION*

#### A. *The Trustee's Preference Claims*

The bankruptcy court held that the Clarendon Premium Transfers ($3,432 transferred fourteen months [5] after the due date), the Clarendon Collateral Transfers ($40,000 transferred in excess of eleven months after the due date), the U.S. Capital Premium Transfers ($11,100 transferred in excess of seven weeks after the due date), and the U.S. Capital Collateral Transfers ($90,750 trans-

---

*with* 72 F.3d at 822 ("[I]t is questionable whether the plan could extend the period during which preference actions could be filed, which is provided by statute." (citing several cases in support and in opposition to this point)).

5. *See* page 1018–19, *infra,* regarding an argument that the Clarendon Premium Transfers were only two months past the due date.

ferred five months after the due date) (collectively, the Transfers) are avoidable under § 547(b) of the Bankruptcy Code.[6] Unable to refute the Trustee's proof regarding the timing or amounts of the Transfers, the Appellants argue that the bankruptcy court erred in avoiding the Transfers under § 547(b) because the Trustee did not prove that the Transfers were of an interest of the Debtor, *i.e.,* Sunset Sales, Inc., but instead were of an interest of K & R, a non-debtor that ceased to exist when the entities merged five days prior to the Chapter 11 filing. *See* 11 U.S.C. § 547(g). They also argue that the Trustee failed to prove that the Transfers were made on account of an antecedent debt owed by the Debtor, Sunset Sales, Inc., as required under § 547(b)(2) because Sunset Sales, Inc. did not become obligated to pay the Appellants until it assumed K & R's obligations on the date of the merger. *Id.* Finally, they contest the bankruptcy court's holdings regarding K & R's insolvency, and the application of the one-year reach back period under § 547(b)(4)(B).

 1. *The bankruptcy court did not err in determining that the Transfers were of an interest of the Debtor in property made on account of an antecedent debt owed by the Debtor*

 Section 547(b) of the Bankruptcy Code states that "transfers of an interest of the *debtor* in property" on "account of an antecedent debt owed by the *debtor*" may be avoided. 11 U.S.C. § 547(b) and (b)(2) (emphasis added). " '[P]roperty of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS,*

496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). It is well-established that the fundamental inquiry under § 547(b) is whether the transfer diminished or depleted the debtor's estate. *Gill v. Winn (In re Perma Pac. Properties),* 983 F.2d 964, 968 (10th Cir.1992) ("The transfer depleted the estate of an asset which would otherwise be available for distribution to other creditors. This is precisely the situation that § 547 seeks to prevent."); 5 *Collier on Bankruptcy* ¶ 547.03[2] at 547–21 (Lawrence P. King ed., 15th ed rev.1997) [hereinafter *Collier* ]. We must look to the broad definition of "property of the estate" under § 541(a) to see if the Debtor's property was transferred. *Begier,* 496 U.S. at 59, 110 S.Ct. at 2263. Section 541(a)(1) provides that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Whether a debtor has an interest in property is determined under state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *see* 5 *Collier* at 547–20.

Under Oklahoma law, the status, rights, and liabilities of corporations that are parties to a merger are as follows:

 When any merger ... shall have become effective pursuant to the provisions of the Oklahoma General Corporation Act, for all purposes of the laws of this state the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged ..., shall cease and the constituent corporations shall become a new corporation, or be merged into one of such corporations ..., possessing all the

---

**6.** Section 547(b) provides:

 Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made–
 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
 (5) that enables such creditor to receive more than such creditor would receive if–
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

rights, privileges, powers ..., and being subject to all the restrictions, disabilities and duties of each of such corporations so merged ...; and all and singular, the rights, privileges, powers· and franchises of each of·said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, ... shall be vested in the corporations surviving or resulting from such merger ...; and all property, rights, privileges, powers ... and all and every other interest shall be thereafter as effectually the property of the surviving ... corporation as they were of the several and respective constituent corporations ...; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations, from that time forward, shall attach to said surviving ... corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

Okla. Stat. Ann. tit. 18, § 1088; *cf. id.* at § 1090 (any action pending by or against any corporation party to a merger shall be prosecuted as if the merger had not taken place). The Tenth Circuit has stated that "the surviving corporation is fully liable and responsible for the acts and obligations of its predecessors" under Okla. Stat. Ann. tit.· 18, § 1.167, a predecessor to § 1088. *Cherokee Labs., Inc. v. Pierson,* 415 F.2d 85, 86 (10th Cir.1969), *cert. denied,* 396 U.S. 1059, 90 S.Ct. 753, 24 L.Ed.2d 753 (1970); *accord American Ry. Express Co. v. Snead,* 96 Okla. 278, 221 P. 1032 (1923); *Collinsville Nat'l Bank v. Esau,* 74 Okla. 45, 176 P. 514 (1918).

▪ It is undisputed that K & R, Evans, and Sunset Sales, Inc. were merged in accordance with Oklahoma law on October 9, 1992. Thus, on the October 14, 1992, petition date, the "Debtor," while named Sunset Sales, Inc., was in fact the surviving corporation resulting from the merger. Okla. Stat. Ann. tit. 18, § 1088; *see* 11 U.S.C. § 101(13) ("'debtor' means person ... concerning which a case under this title has been commenced[.]"). Under Oklahoma Statute § 1088 and § 541(a)(1), the Debtor's estate included K & R's assets, *i.e.,* its right to pursue avoidance actions and its interest in funds recovered pursuant to such actions, and K & R's liabilities, *i.e.,* its debts to the Appellants. 11 U.S.C. § 541(a)(1); Okla. Stat. Ann. tit. 18, § 1088; *Cherokee Labs.,* 415 F.2d at 86. Indeed, the Appellants filed proofs of claim against the Debtor asserting claims resulting from their contracts with K & R, and invoiced the Debtor for postpetition Premium Payments and Collateral Payments. Thus, the Transfers clearly resulted in a diminution of the Debtor's estate in this case, because the Debtor's estate included K & R's estate under Okla. Stat. Ann. tit. 18, § 1088. The Debtor's estate would have included the money transferred to the Appellants, but for K & R's transfer of such funds to the Appellants during the prepetition year.

The Appellants' maintain that K & R and the Debtor were separate entities at the time the transfers were made, and an alter ego action was not asserted by the Trustee. Yet, an alter ego action was unnecessary. The consolidation of K & R's assets and liabilities with those of Sunset Sales, Inc. was accomplished by the prepetition merger.

The Appellants also contend that K & R ceased to exist when the merger took place. *See Exchange Bank v. Meadors,* 199 Okla. 10, 184 P.2d 458, 464 (1947). Since K & R did not exist on the date that the Debtor's bankruptcy case was filed, the Appellants maintain that it could not be part of the bankruptcy proceedings. While it is true that the "separate existence" of K & R "cease[d]" ·upon the merger, that does not mean that its rights, powers, assets and liabilities, among other things, disappeared. Okla. Stat. Ann. tit. 18, § 1088. Rather, they are now possessed by the Debtor and the Debtor is also "vested" with all property, powers and privileges of K & R. *Id.* Sunset Sales, Inc., the entity that filed a Chapter 11 petition, is the "debtor," 11 U.S.C. § 101(13), and its estate includes all of the rights, privileges, powers, property, and debts of K & R. *Id.* at § 541(a)(1). Upon *de novo* review, we conclude that the bankruptcy court did not err in determining that the Transfers were transfers of an interest of the Debtor in property as required under § 547(b) and

made on account of an antecedent debt owed by the Debtor as required under § 547(b)(2).

### 2. The bankruptcy court did not err in allowing the Appellee to present evidence of the Debtor's insolvency

The Appellants' objected to the Trustee's presentation of evidence regarding the Debtor's insolvency because the Trustee failed to assert insolvency in his complaint, he did not amend his complaint to include such an allegation, and the pretrial order precluded contentions outside the respective pleadings of the parties. The bankruptcy court overruled this objection. The Appellants claim this ruling was in error, that the Trustee should not have been allowed to present his insolvency evidence, and that judgment should have been entered for them because, without this evidence, the Trustee would not have met his burden of proving the Debtor's insolvency under § 547(b)(3).

■ First, we note that the bankruptcy court summarily overruled this objection at trial, stating that it had already ruled on the issue during the final pretrial conference. Thus, the bankruptcy court must have stated its rationale for overruling the Appellants' objection at the pretrial conference. Yet, the Appellants have not provided this Court with a copy of the pretrial conference transcript. Accordingly, we do not know the reasons why the bankruptcy court overruled their objection. This alone compels this Court to affirm the bankruptcy court as the Appellants have not complied with their obligation to provide this Court with an adequate record for review. *See, e.g., McGinnis v. Gustafson*, 978 F.2d 1199, 1200–01 (10th Cir. 1992) (court would not review ruling when appellant did not include transcript of oral ruling; the failure to do so raised "an effective barrier to informed, substantive appellate review."); *Deines v. Vermeer Mfg. Co.*, 969 F.2d 977, 979–80 (10th Cir.1992) (appellate court must affirm if record is insufficient to permit assessment of appellant's claims of error); *In re Rambo*, 209 B.R. 527 (10th Cir. BAP), *aff'd without opinion*, 132 F.3d 43 (10th Cir.1997) (bankruptcy court order affirmed because appellant did not provide adequate record for review).

■ Even if we were to rely on the limited record before us, the bankruptcy court did not err in overruling the objection and allowing the Trustee's insolvency evidence. A trial court's admission or exclusion of evidence is reviewed for abuse of discretion. *See, e.g., Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir.1995). This includes the allowance of testimony of witnesses. *See, e.g., United States v. Davis*, 40 F.3d 1069, 1076 (10th Cir.1994), *cert. denied*, 514 U.S. 1029, 115 S.Ct. 1387, 131 L.Ed.2d 239 (1995) *and* 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995).

■ We do not have a "'definite and firm conviction that the [bankruptcy] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Moothart*, 21 F.3d at 1504 (quoting *McEwen*, 926 F.2d at 1553–54). It is clear that the Appellants were not prejudiced by the admission of the evidence as they themselves prepared and presented insolvency evidence in opposition to the Trustee's case. The Appellants also had an opportunity to depose the Trustee, one of the expert witnesses on the insolvency issue. Furthermore, the final pretrial order, as well as earlier pleadings in the case, put the Appellants on notice that insolvency evidence would be presented by the Trustee. In fact, three of the Trustee's witnesses and two of the Appellants' witnesses were listed in the pretrial order as anticipated to give evidence regarding the solvency issue. The pretrial order superseded the pleadings and "control[led] the subsequent course of the action." Fed. R. Bankr.P. 7016; Fed.R.Civ.P. 16(e). Therefore, upon an abuse of discretion review, we conclude that the bankruptcy court did not err in allowing the Appellee to present insolvency evidence.

### 3. The bankruptcy court did not err in finding that the Debtor was insolvent as required under § 547(b)(3)

Section 547(b)(3) of the Bankruptcy Code requires that the Debtor be insolvent when the transfers were made. A corporation is "insolvent" according to the Bankruptcy Code when it has a "financial condition such

that the sum of such entity's debts is greater than all of the such entity's property, at a fair valuation," exclusive of property fraudulently transferred or exempt assets. 11 U.S.C. § 101(32)(A).

■ The bankruptcy court held that K & R was insolvent from October 31, 1991 until the merged entity filed Chapter 11 on October 14, 1992, and all of the Transfers were made during this period. Appellants' assert this holding is in error because the proper method of valuing the Debtor's assets was to use book value; that is, the purchase price of the assets less accumulated depreciation. However, the bankruptcy court rejected this valuation and stated that "fair valuation" of the Debtor's assets and liabilities under § 101(32)(A) was to be determined based on what "the assets and liabilities of this debtor ... are worth in the realistic marketplace, not merely what was shown on its balance sheet." The bankruptcy court stated that, contrary to the Appellants' contentions, the book value of the Debtor's assets and liabilities was "unrealistic" because the Debtor was on its "deathbed."

Instead, the bankruptcy court relied, to a large extent, on the Trustee's theory of insolvency, valuing the Debtor's assets based on the sales price that the Trustee obtained from sales pursuant to the Plan or, in the case of accounts receivable, the amounts that he had actually collected. The evidence was undisputed that this valuation was a conservative methodology because it represented the price that the Trustee had obtained for an asset, plus an upward adjustment of fifty percent of the sales price to account for depreciation that may have ensued from October 31, 1991, to the actual date of sale. Moreover, this method of valuation did not include a downward adjustment for the costs that the Trustee incurred in selling the assets. Based on this approach, the bankruptcy court concluded that the Debtor was insolvent by at least $1,835,000 on October 31, 1991, and that its financial condition continued to worsen after that date.

■ While the bankruptcy court's legal interpretation of § 101(32)(A) is reviewed *de novo*, the bankruptcy court's determination that the Debtor was insolvent is a finding of fact that is subject to review under a clearly erroneous standard. *See Gillman v. Scientific Research Products Inc. (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555 (10th Cir. 1995). Upon *de novo* review of the bankruptcy court's interpretation of "insolvency," we conclude that it did not err. In *Mama D'Angelo,* the Tenth Circuit stated:

We are mindful of the authority to the effect that fair valuation ordinarily must be made from the vantage of a going concern and . that subsequent dismemberment should not enter.into the picture. But we "may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the ·pertinent date." Thus, it is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of circumstances.

. . . .

The bankruptcy court conducted the necessary appraisal of Mama D'Angelo based on the evidence of record indicating that, at the time of the repayment of the Scientific loans ..., it was insolvent and therefore no longer a going concern. We give substantial leeway on questions of valuation:

[T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of the property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in [§ 101(32) ] by the most appropriate means. The bankruptcy court's findings are not clearly erroneous.

55 F.3d at 555–57 (citations omitted). Thus, it was not "improper hindsight" for the bankruptcy court to take into account the sales price of the assets plus an adjustment for depreciation, as opposed to the Debtor's book value, in determining the Debtor's insolvency under § 101(32)(A). Nor was it improper for

the bankruptcy court to disregard the Debtor's book value of certain of its liabilities based on the actual amount of the liabilities.

Furthermore, based on our review of the record and the findings of the bankruptcy court, we do not have a " 'definite and firm conviction' " that the bankruptcy court's factual findings are erroneous. *Id.* at 555 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)). The bankruptcy court accepted the book values proposed by the Appellants for all but four categories of the Debtor's assets, and for one of its liabilities. The bankruptcy court found that the Debtor's accounts receivable owed by affiliates and by stockholders, carried at a book value of $306,000 and $220,000, respectively, were in fact worthless. This finding was based on the evidence that the Trustee was never able to collect on the accounts, as well as the Appellants' failure to present evidence as to the "fair value" of these accounts. The bankruptcy court found an asset designated as "leasehold, mine development and land," carried at a book value of $1,583,000, to have a value of $304,000, based upon its assessment that the Trustee's expert witnesses were more credible then the Appellants' expert witness.

The valuation of the remaining asset, mining equipment, carried on the Debtor's books at a value of $7,468,000, was most hotly contested. The bankruptcy court valued the assets at $3,801,000, utilizing the price eventually received by the Trustee when the equipment was sold or the amount by which secured creditors reduced their claims in exchange for the surrender of collateral, and then adding back a substantial adjustment for economic depreciation. This finding is fully supported by the record. As of October 31, 1991, the Debtor was not paying royalties, and it had written "hot" checks in the total amount of $131,000. Thus, there is evidence in the record to support the bankruptcy court's finding that the Debtor was on its "deathbed," and to justify the consideration of liquidation values. The Debtor filed Chapter 11 and the Trustee was appointed within three months of the petition date. The Trustee's Plan called for the Debtor's liquidation. The Trustee attempted to sell the assets of K & R as a going concern, but was unable to find a buyer. Certain of the mining equipment was extremely specialized, could not be sold in place because the Debtor's coal reserves were depleted, was unsuitable for operation in the majority of reserves in the State of Oklahoma, and was costly to relocate. Given all of these facts, it was appropriate for the bankruptcy court to disregard the book values of K & R's assets and apply the Trustee's actual sales price plus depreciation. Indeed, the only evidence in support of application of the Debtor's book values was the testimony of the Debtor's former oil and gas accountant, who testified that he was unfamiliar with § 101(32)(A), and upon an appraisal that the bankruptcy court found to have little probative value.

Finally, the bankruptcy court held that the Debtor's reclamation liability, one of the Debtor's most significant liabilities, had a fair value in excess of $1,000,000. The court again refused to apply the Debtor's book value of $432,000, stating that "[t]he most credible proof is that the liability is in the amounts required by the governmental entities for the debtor's bonds." From our review of the record, these factual findings are not clearly erroneous.

We note that the bankruptcy court incorrectly stated that the Debtor was presumed to be insolvent at the time of the Transfers, most of which apparently occurred more than ninety days prior to filing, and that it was the Appellants' burden to overcome that presumption. It was the Trustee's burden to establish all elements of § 547(b), including insolvency. 11 U.S.C. § 547(g); *Mama D'Angelo,* 55 F.3d at 554; *ABB Vecto Gray, Inc. v. First Nat'l Bank (In re Robinson Bros. Drilling, Inc.),* 9 F.3d 871 (10th Cir.1993). The presumption of insolvency set forth in § 547(f) merely means that if the creditor does not produce some evidence of solvency, the trustee will prevail on the issue as to the ninety-days preceding bankruptcy. 5 *Collier* ¶ 547.13. However, despite this misstatement by the bankruptcy court, it is clear from our independent review of the record that the Trustee met his burden of proof under § 547(b) and (g).

■ Finally, the Appellants contend that Mr. Deeba, one of the Trustee's expert witnesses on insolvency, was not credible and that his testimony should have been disregarded by the bankruptcy court. The bankruptcy court, not this Court, is in the best position to judge the credibility of the witnesses, and as such its reliance on the testimony is reviewed for abuse of discretion. *See, e.g., Davis,* 40 F.3d at 1078. Upon an independent review of the record, we are most certain that the bankruptcy court did not err in relying on Mr. Deeba's testimony.

4. *The bankruptcy court did not err in applying the one-year reach back period under § 547(b)(4)(B)*

Section 547(b)(4)(B) provides that the Trustee may avoid transfers made between ninety days and one year before the petition date if the transfers were made for the benefit of a creditor who was an insider of the Debtor. *See* 11 U.S.C. § 101(10) and (31) (defining "creditor" and "insider"). In *Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Bros. Drilling, Inc.),* 892 F.2d 850 (10th Cir.1989), the Tenth Circuit held that the one-year reach back period set forth in § 547(b)(4)(B) may apply if the transfer benefitted an insider of the debtor who was a guarantor or co-debtor on the debt in question. The bankruptcy court held that under § 547(b)(4)(B), as interpreted in *Robinson Bros.,* the one-year reach back period applied in this case (which was commenced prior to the October 22, 1994, effective date of the amendments to § 550(c)), because the Transfers benefitted Dahlgren, an insider-guarantor, and Delta, an insider-codebtor.

On appeal, the Appellants contend that the one-year reach back period should not apply because at the time the Transfers were made, the insiders were creditors of K & R, not the Debtor, Sunset Sales, Inc. For the reasons set forth above, K & R is the Debtor. Accordingly, the insiders were creditors of the Debtor-they need not have been creditors of the pre-merger Sunset Sales, Inc.

The Appellants also assert that the one-year reach back period should not apply because the Trustee did not present any evidence that Dahlgren and Delta, the insider-creditors, received a "cognizable benefit"

from the Transfers as required under *Travelers Insurance Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Services, Inc.),* 980 F.2d 792 (1st Cir.1992). While the Appellants have stated the correct legal standard, they misunderstand its application.

■ A "cognizable benefit" test is applicable in this Circuit. *Lowrey v. Manufacturers Hanover Leasing Corp. (In re Robinson Bros. Drilling, Inc.),* 6 F.3d 701, 703 (10th Cir.1993), *cert. denied,* 510 U.S. 1214, 114 S.Ct. 1336, 127 L.Ed.2d 684 (1994). But, in *Robinson Bros.,* the court made clear that with any reduction in a codebt, the insider-creditor will receive a "quantifiable monetary reduction" in its financial liability. *Id.* The court stated: "Thus, '[t]here can be no question that [for purposes of the preference statute] an insider-guarantor derives measurable economic benefit from a payment on the guaranteed debt, *to the extent the insider's contingent liability on the personal guaranty is reduced.'* " *Id.* (alterations and emphasis in original) (quoting *Erin Food Services,* 980 F.2d at 797). This is true even if the insider-creditor is insolvent and remains insolvent even after the transfer. *Id.* Thus, any payment on a codebt will be presumed to be for the benefit of an insider-creditor. The Trustee proved that K & R made payments to the Appellants that reduced the co-obligations of Dahlgren and Delta and, therefore, he met his burden of showing that the insider-creditors received a cognizable benefit.

**B.** *The Appellants' Preference Defenses*

■ Subsection (c) of § 547 provides several defenses to creditors whose transfers would otherwise be avoidable under subsection (b). *See* 11 U.S.C. § 547(c). The Appellants contend that the bankruptcy court erred in rejecting the Appellants' defenses under § 547(c)(1), (2) and (4). The Appellants had the burden of proving the nonavoidability of the Transfers under § 547(c). *Id.* at § 547(g).

1. *The bankruptcy court did not err in determining that the transfers were not intended to be a contemporaneous exchange for new value under § 547(c)(1)*

The bankruptcy court rejected the Appellants' defenses to the preference action, and

held that § 547(c)(1)[7] did not apply to the Transfers because they were not "in fact a substantially contemporaneous exchange" as required under § 547(c)(1)(B). In support of this finding, the bankruptcy court stated that the payments, presumably the Clarendon Premium Transfers and the U.S. Capital Premium Transfers, were made after the respective Bonds were issued. The bankruptcy court also found that the Clarendon Bonds and U.S. Capital Bonds were issued months before either the Clarendon Collateral Transfers or the U.S. Capital Collateral Transfer were made, and the Appellants did not give any new value when such Transfers were made.

The Appellants contend that the bankruptcy court erred for several reasons. As to the Clarendon Premium Transfers, the Appellants maintain that they were made to renew some of the Clarendon Bonds and, therefore, were "in fact" substantially contemporaneous transfers. The findings of fact of the bankruptcy court indicates that as of April of 1992, no Collateral Payments or Premium Payments had been made by K & R on the Clarendon Bonds. If this is true, then the Clarendon Premium Transfers, made in July of 1992, were clearly not a substantially contemporaneous exchange for the Clarendon Bonds which were issued in May of 1991.

 There is some evidence in the record to support the Appellants' contention that the Clarendon Premium Transfers were to renew the Clarendon Bonds. However, even assuming that the Clarendon Premium Transfers were to renew the Clarendon Bonds and that the "renewal" of the Clarendon Bonds

constituted "new value,"[8] the Transfers were not made until July, 1992. This was not in fact a substantially contemporaneous exchange as the Bonds must have been renewed in May of 1992, one year after they were originally issued. Indeed, a postpetition invoice related to the Clarendon Bonds shows that renewal invoices were generated on the last day of April, the anniversary of the issuance of the Bonds.

The Appellants next argue that the bankruptcy court erred in not finding the U.S. Capital Premium Transfers to be a substantially contemporaneous exchange because they were made approximately seven weeks after the U.S. Capital Bonds were issued. The bankruptcy court did not err in determining that a transfer made seven weeks after the tendering of new value is not, under the circumstances of this case, "in fact" a substantially contemporaneous exchange as required by § 547(c)(1)(B).

Finally, the Appellants claim that the bankruptcy court erred in finding that the Clarendon and U.S. Capital Collateral Transfers were not substantially contemporaneous because, even though they were made several months after the respective Bonds had been issued, Clarendon and U.S. Capital continued to provide "value" because their Bonds allowed the Debtor to continue mining. The bankruptcy court correctly determined that such "value" was not "new value" as required under §§ 547(a)(2)[9] and 547(c)(1).

Our conclusion is supported by *Electronic Metal Products, Inc. v. Bittman (In re Electronic Metal Products, Inc.),* 916 F.2d 1502

---

7. Section 547(c)(1) provides that a trustee may not avoid a preferential transfer to the extent that the transfer was–
 (A) intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange[.]
 11 U.S.C. § 547(c)(1).

8. It is unclear whether the Appellants provided "new value" when they "renewed" the Bonds. *See* 11 U.S.C. § 547(a)(2). According to their own admission, the Bonds were "irrevocable" and renewed automatically for a five-year period despite the Debtor's payments. We need not reach this issue, however, because we find that even if the Clarendon Premium Transfers were to

"renew" the Bonds, the payments were late, as the bankruptcy court determined, and, therefore, were not a substantially contemporaneous exchange.

9. "New value" is defined in § 547(a)(2) as–

 money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]
 11 U.S.C. § 547(a)(2).

(10th Cir.1990) (per curiam). In that case, an attorney who had been paid by the debtor for his services during the ninety days preceding the debtor's bankruptcy case argued that even if the transfer was preferential under § 547(b), it should nonetheless be nonavoidable under § 547(c)(1) because he continued to represent the debtor and his work resulted in a benefit to the estate that was greater than the fees that he had received. The Tenth Circuit rejected this argument, stating:

> "[T]he fact that [the creditor] may have promised to continue to do business with [the debtor] if it paid its bills is not new credit or new value to the estate." *Lowrey v. U.P.G., Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32, 34 (10th Cir. 1989). We are prompted to extend this holding to legal representation for three reasons. First, were we to hold otherwise, nearly any preferential transfer for or on account of an antecedent debt in the circumstance of an ongoing attorney-client relationship would be insulated from recovery as a preference under section 547(c)(1). *See id.* Second, "the Bankruptcy Code's definition of the term 'new value' implies that the creditor must prove the specific valuation in 'money or money's worth in goods, services, or new credit.'" *Id.*

*Id.* at 1506; *but see Spears v. Michigan Nat'l Bank (In re Allen)*, 888 F.2d 1299, 1302–03 (10th Cir.1989) (valuation of the transfer is not a consideration); *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.)*, 792 F.2d 125, 128 (10th Cir.1986) (same). In this case, the fact that the Appellants continued to provide the Bonds to K & R is not "new credit" or "new value" to the estate. To hold otherwise would make nearly all debtor-creditor relationships insulated from recovery under § 547(b). Also, there is no way to value what "new value" the Appellants provided. Indeed, the Appellants have alleged that the Bonds were irrevocable and would have been renewed for a five-year period even if the

Debtor did not make any payments. More importantly, the Appellants did not present any evidence as to the value of their purported "new value." *See* 11 U.S.C. § 547(g) (Appellants had the burden of proof as to § 547(c)(1)). Rather, they have merely argued that the Bonds allowed K & R to continue to conduct its mining operations. This is simply not sufficient under *Electronic Metal Products* and *Robinson Bros. Drilling*.

2. *The bankruptcy court did not err in determining that the transfer was not subject to the ordinary course of business defense under § 547(c)(2)*

The bankruptcy court also denied the Appellants § 547(c)(2) [10] defense. Subsection (B) of this section creates a subjective test, *i.e.*, whether the transfers were ordinary as between the parties, and subsection (C) creates an objective test, *i.e.*, whether the transfers were ordinary in the industry. *See, e.g., In re Midway Airlines, Inc.*, 69 F.3d 792, 797–98 (7th Cir.1995) (citing cases). This "defense should be narrowly construed." *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). Findings under these subsections are generally considered factual and are, therefore, subject to the clearly erroneous standard of review. *Id.; Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied*, 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994).

Courts consider four primary factors to determine if payments are ordinary between the parties as required under the subjective test set forth in subsection (B): (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under

---

**10.** Section 547(c)(2) provides that a preferential transfer may not be avoided to the extent that it was–

 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

 (C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

which the payment was made. These factors are typically considered by comparing pre-preference period transfers with preference period transfers. *See, e.g., Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 732 (9th Cir.1994); *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 244 (6th Cir.1992). In the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract. Late payments are typically not "ordinary," unless the creditor establishes that a pattern of late payments was ordinary between the parties. *See, e.g., Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.,* 83 F.3d 253, 257 (8th Cir.1996) (creditor failed to establish that consistently late payments were part of the parties' usual course of dealing); *Grand Chevrolet,* 25 F.3d at 732 (although late payments are not *per se* out of the ordinary, delay is particularly relevant in taking a payment outside the ordinary course of business exception); *Fred Hawes Org.,* 957 F.2d at 244 ("A late payment will be considered 'ordinary' only upon a showing that the late payments were the normal course of business between the parties.") (citing cases). In interpreting the objective test under subsection (C), the Tenth Circuit has held that "ordinary business terms" are terms used in " 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy." *Meridith Hoffman,* 12 F.3d at 1553, *quoted in M & L,* 84 F.3d at 1339.

The bankruptcy court held that the Appellants had failed to prove that § 547(c)(2) applied to the Clarendon and U.S. Capital Collateral Transfers. On appeal, the Appellants argue that the Clarendon and U.S. Capital Collateral Transfers were protected under § 547(c)(2) because: (1) the debt was incurred in the ordinary course of both entities, as the Clarendon and U.S. Capital Bonds were required by state law and Clarendon and U.S. Capital were engaged in the business of bonding; (2) the Collateral Transfers were made in the ordinary course even though they were "late payments," as a regular pattern of payment was never established between the parties; and (3) the Collateral Transfers were according to ordinary business terms, in that the indemnity contracts were standard in the industry.

Assuming that the Collateral Transfers were payments of debts incurred in the ordinary course of business of K & R and Clarendon and U.S. Capital, and assuming the evidence of irregular payments was sufficient to prove that late payments were ordinary between the parties in accordance with § 547(c)(2)(A) and (B), the Appellants' § 547(c)(2) defense fails because, as the bankruptcy court determined, they did not meet their burden of proving § 547(c)(2)(C). *See* 11 U.S.C. § 547(g) (Appellants had the burden of proof). Although the Appellants offered evidence that the contractual terms were ordinary in the industry, they did not offer any evidence that it was bonding industry practice to accept, or mining industry practice to pay, collateral payments several months after they are due. The Clarendon Collateral Transfers were also made only after Van–American demanded payment from K & R.

The Appellants contend that the bankruptcy court failed to make any findings of fact regarding the Clarendon or U.S. Capital Premium Transfers. This is partially incorrect. The bankruptcy court did make findings regarding the timing of the Premium Transfers that were made fourteen months and eleven months after the due date. However, the bankruptcy court's ruling that there was no credible evidence to show that the act of securing over $130,000 in antecedent, unsecured debt was in the ordinary course of the business of either party and that the payment could not be construed as made according to ordinary business terms or in the ordinary course of the business of either party, related only to the Collateral Transfers.

Our independent review of the record indicates that the Appellants did not meet their burden of proof as to the Premium Transfers because, as with the Collateral Transfers, they did not offer any evidence regarding § 547(c)(2)(C). Moreover, the Appellants have not directed us to any part of the record to show that evidence was presented that the Premium Transfers, made several months after they were due, were payments made

according to industry practice. We will not remand this matter to the bankruptcy court simply to allow it to make a negative finding when the appellate record before us that appears to be complete makes clear that the Appellants did not meet their burden of proof. *See, e.g., Park County Resource Council, Inc. v. United States Dep't of Agriculture,* 817 F.2d 609, 617 (10th Cir.1987) (remand is not necessary where it is in the interest of judicial economy and efficiency to decide a matter) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 923 n. 2 (10th Cir.1986)), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992), *cert. denied,* 506 U.S. 817, 113 S.Ct. 59, 121 L.Ed.2d 27 (1992). Rather, based on the record before us, we conclude that the bankruptcy court did not err in determining that § 547(c)(2) did not apply because the Appellants failed to meet their burden of proof.

3. *The bankruptcy court did not err in determining that the transfer was not subject to the new value defense under § 547(c)(4)*

The Appellants asserted a "new value" defense as set forth in § 547(a)(2). *See* n. 8, *supra.* The bankruptcy court stated that under § 547(c)(4)[11] the Appellants were required to prove that: (1) a preference was received; (2) after the preference was received, the Appellants must have advanced additional credit to the Debtor on a unsecured basis; and (3) the post-preference credit was unpaid in whole or in part on the petition date. *See e.g., Kroh Bros. Dev. Co. v. Continental Constr. Engineers, Inc. (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 653 (8th Cir.1991); 5 *Collier* ¶ 547.04[4]; *but see, e.g., Laker v. Vallette (In re Toyota of Jefferson, Inc.),* 14 F.3d 1088, 1091 (5th Cir.1994) ("new value" need not be unpaid). Applying this test, the bankruptcy court concluded that § 547(c)(4) did not apply because the Clarendon Additional Bonds were not unpaid on the Debtor's petition date as Premium Payments

had been paid. The Appellants do not contest the legal test applied by the bankruptcy court, but rather maintain that it erred in finding that the Collateral Payments were made. They also argue that the Premium Payments were not payment in full of the Clarendon Additional Bonds.

The record is unclear as to whether the Clarendon Additional Bonds required Collateral Payments. Nevertheless, the bankruptcy court's finding that Premium Payments were made in full as of the petition date was not clearly erroneous. The Appellants contend that they issued new value in the face amount of the Clarendon Additional Bonds. Yet, as the Trustee correctly points out, new value is not based on the face value of the Bonds. By making Premium Payments on the Clarendon Additional Bonds, the unsecured debt was paid on the petition date and, therefore, § 547(c)(4) does not apply.

## V. CONCLUSION

For the reasons set forth above, the judgment is AFFIRMED.

---

11. Section 547(c)(4) provides that a preferential transfer may not be avoided to the extent that it was–

 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–

 (A) not secured by an otherwise unavoidable security interest; and

 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4).