In the Matter of CRAIG OIL COMPANY, Debtor.

William M. FLATAU, Trustee, Plaintiff,

v.

MARATHON OIL COMPANY, Defendant.

Bankruptcy No. 81–51237–Mac.
Adv. No. 82–5051.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

July 1, 1983.

John C. Weitnauer of Alston, Miller & Gaines, Atlanta, Ga., for plaintiff.

William M. Flatau of Brown, Katz, Flatau & Hasty, Macon, Ga., for trustee.

Thomas C. James III of Jones, Cork & Miller, Macon, Ga., for defendant.

O. Hale Almand, Jr., Macon, Ga., for Ruby Horne.

## MEMORANDUM OPINION ON COMPLAINT TO AVOID PREFERENTIAL TRANSFERS

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

Craig Oil Company (hereinafter Craig) filed its petition with this Court under Chapter 11 of the United States Bankruptcy Code on November 6, 1981. On December 3, 1981, the case was converted voluntarily to Chapter 7, and on December 9, 1981, a trustee was appointed. In this adversary proceeding, the issue before the Court is whether certain transfers by Craig to Marathon Oil Company (hereinafter Marathon) may be avoided by the trustee.

The trustee filed his complaint against Marathon on February 23, 1982. The complaint asserts that transfers in the amount of $127,098.90 were preferential transfers and that the transfers may be recovered by the trustee through the use of his avoiding power.[1] After reviewing the evidence and considering the arguments and briefs of counsel, the Court is of the opinion that the trustee is entitled to recover the $127,098.90 from Marathon. In support of its conclu-

---

1. 11 U.S.C.A. § 547 (West 1979).

sion, the Court publishes the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Marathon supplied gas to Craig from 1977 to 1981. In the ordinary course of business, Craig used authorized access cards to draw gas from the Marathon terminal located in Macon, Georgia. After Craig had drawn gas from Marathon's terminal, Marathon would send Craig an invoice, with payment being due ten days from the date of the invoice. There was a six-day grace period built into the billing system. If payment was not received within sixteen days, Marathon's computers would produce an "exception report," alerting Marathon that Craig had not paid the invoice timely.

Marathon, as part of its ordinary business procedures, recorded the "average days to pay" of each of its customers. This figure was a calculation based on the weighted average dollar payments of a customer between the invoice date and the date of payment. In February of 1981, the "average days to pay" for Craig was twenty, a figure that was so high that Marathon temporarily ceased to supply Craig with gas. The "average days to pay" figure for Craig was also twenty in September of 1981. With the exception of February and September, Craig's payments during 1981 were characterized by Mr. Bruce Mabee, the former southern regional credit manager of Marathon, as being early or average.

To secure its position when dealing with corporations, Marathon customarily obtained the personal guarantee from one of the corporation's major shareholders and, if married, the spouse. Marathon obtained the personal guarantees of Tim Dennard and his wife, Amy Dennard. Prior to 1981, Tim Dennard was president of Craig and was its major shareholder.

On August 14, 1981, a representative from Southern Petroleum Trading Co., Ltd. called Mr. Mabee and inquired as to whether Marathon would be interested in joining in an involuntary bankruptcy petition against Craig. The representative from Southern Petroleum related that Craig owed Southern Petroleum some $800,000. Mr. Mabee told Southern Petroleum's representative that Marathon was not interested in joining in the involuntary bankruptcy petition.

After receiving the call from Southern Petroleum, Mr. Mabee and other Marathon representatives reviewed the Craig account and found that although Craig was paying timely and regularly, it was over its $100,000 credit limit. Mr. Mabee then telephoned Craig.[2] Mr. Mabee informed Craig of the call from Southern Petroleum and requested that Craig send Marathon current financial statements. Mr. Mabee also stated that anything Craig could do to assure Marathon of Craig's good faith would be appreciated. In that regard, Mr. Mabee mentioned that several of Marathon's customers paid by wire transfers.

In response to Mr. Mabee's call, Craig began to pay Marathon with cashier's checks. All checks deposited in Marathon's lockbox by Craig on and after August 21, 1981 were cashier's checks. On August 27, 1981, Craig informed Marathon that Craig no longer had customers in the Macon, Georgia area, and as a result, it no longer needed to make purchases from Marathon. August 27, 1981 was the date of the last purchase made by Craig from Marathon.

After its last purchase on August 27, 1981, Craig owed Marathon a total of $127,098.90. After August 27, 1981, Craig continued to pay Marathon with cashier's checks. From August 27, 1981 to September 16, 1981, Craig paid Marathon the entire $127,098.90 in a series of fourteen cashier's checks. It is this amount that the trustee seeks to recover.

The trustee asserts that the fourteen cashier's checks were preferential transfers within the meaning of section 547(b) of the Bankruptcy Code, and as such are subject to the avoidance power of the trustee. Section 547(b) provides:

---

**2.** The record is not clear as to with whom Mr. Mabee spoke.

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1979).

The parties stipulate that all of the elements of a preferential transfer contained in section 547(b) are present. Marathon, however, asserts that the exceptions of section 547(c)(2) and (4) are applicable, and that the trustee therefore may not recover the payments. Section 547(c) provides in part:

(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

. . . .

11 U.S.C.A. § 547(c)(2), (4) (West 1979).

The parties stipulate that the issues before the Court are whether the $127,098.90 in payments to Marathon fit within either section 547(c)(2), the "ordinary course of business" exception, or whether they fit within section 547(c)(4). If the payments fit within either section, then the trustee may not recover the payments. The Court first will address the issue of section 547(c)(2).

To fall within section 547(c)(2), the payments must have been (1) made in payment of a debt incurred in the ordinary course of business of the debtor and transferee, (2) made not later than forty-five days after the debt was incurred, (3) made in the ordinary course of business of the debtor and the transferee, and (4) made according to ordinary business terms. The parties stipulate that the debts were incurred in the ordinary course of business and that the payments were made within forty-five days of the date upon which the debts were incurred. The only questions before the Court are whether the payments were made in the ordinary course of business of Marathon and Craig, and whether the payments were made according to ordinary business terms.

The Court is of the opinion that the fourteen payments by cashier's checks were not made in the ordinary course of business

of Marathon or of Craig. The legislative history of section 547(c)(2) states that the "purpose of this exception is to leave undisturbed *normal* financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors...." S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6329 (emphasis added).

In this adversary proceeding, Craig had been paying Marathon regularly with Craig's corporate checks. It was current in its payments and was on good terms with Marathon. After Marathon received the telephone call from Southern Petroleum, Marathon became concerned over the financial condition of Craig and demanded some assurance that it would be paid if it continued to supply Craig with gas.

Craig then began to pay Marathon with cashier's checks. The evidence reveals that during this time, Craig was experiencing cash flow problems and was having difficulty paying its other creditors. An officer of Craig testified that the cashier's checks were paid to Marathon to show Craig's good faith. Mr. Mabee, formerly of Marathon, testified that except for barge accounts, only one percent of Marathon's accounts were paid by certified or cashier's check.

After payments had been made by cashier's checks for a period of around one week, Craig ceased to make purchases from Marathon but continued to make payments to Marathon with cashier's checks, allegedly to assure Marathon of its "good faith." The Court can perceive of no reason that would require Craig to assure Marathon of its good faith when Craig no longer needed to obtain credit from Marathon. Craig's stated reason for the payments is thus put squarely at issue.

The Court is of the opinion that Craig gave Marathon preferential treatment because of its desire to insure that Marathon

would not join in an involuntary petition with Southern Petroleum.[3] Marathon "suggested" to Craig that it make wire transfers in order to "assure" Marathon of Craig's good faith. Whether this was intended as a threat to Craig is not at issue; what is clear is that Craig began to *prefer* Marathon right after receiving the call from Marathon. As a direct result of this telephone call from Marathon, Craig treated Marathon differently than it treated its other creditors. This is the type of preferential treatment that section 547 of the Bankruptcy Code is designed to prevent.

The Court does not find that payment by certified or cashier's check is outside the scope of ordinary business practice in and of itself. Rather, in the context of the circumstances of this case, the Court finds that Craig's payments to Marathon by cashier's checks were made neither in the ordinary course of Marathon's business or Craig's business nor according to their ordinary business terms.

Having determined that the payments by Craig to Marathon were not within the ordinary course of the business of Craig or Marathon, the Court now will turn to section 547(c)(4). Marathon contends that section 547(c)(4) should be interpreted by the Court to hold that once a preferential payment is made in payment of a single invoice, all new value thereafter may be netted against not only that preferential payment but all subsequent preferential payments. Marathon cites the Court to the following legislative history of section 547(c)(4) to support its argument. That legislative history states:

The fourth exception codifies the net result rule in section 60c of current law. If the creditor and the debtor have more than one exchange during the 90-day period, the exchanges are netted out according to the formula in paragraph (4). Any new value that the creditor advances must be unsecured in order for it to qualify under this exception.

---

**3.** It should also be noted that Tim Dennard, the major shareholder of Craig, and his wife had

personally guaranteed the debt of Craig to Marathon.

S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 374, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6330. Marathon's argument, upon careful analysis, must fail. Although the legislative history to section -547(c)(4) does indicate that the section was meant to be a codification of the net result rule [4] of section 60c of the former Bankruptcy Act,[5] the clear language of section 547(c)(4) provides otherwise.

■ In considering the intent of Congress in enacting section 547(c)(4), the Court first should look to the plain meaning of the section itself. *Fitzpatrick v. Internal Revenue Service,* 665 F.2d 327 (11th Cir. 1982). Where the statutory language is clear and unambiguous, it is not necessary for the Court to look to the legislative history of the section. *Alabama Great Southern Railroad Co. v. Eagerton,* 663 F.2d 1036 (11th Cir.1981).

■ In the instant case, the Court finds that the language of section 547(c)(4) is clear and unambiguous. The section precludes a trustee from avoiding an otherwise voidable preference provided that the transfer is "to or for the benefit of a creditor, to the extent that, *after such transfer,* such creditor gave new value to or for the benefit of the debtor . . . ." 11 U.S.C.A. § 547(c)(4) (West 1979) (emphasis added). Marathon argues that once a preferential payment is made, all new value thereafter may be netted against that preferential payment and all subsequent preferential payments, regardless of when made. The

position taken by Marathon is clearly inconsistent to the plain wording of section 547(c)(4).

The language of the section makes it clear that section 547(c)(4) was not intended to be a codification of the net result rule. The net result rule of old law depended more on the creditor's knowledge of the debtor's insolvency rather than concerns for creditor's interests or enrichment of the estate. 4 Collier on Bankruptcy ¶ 547.40 (15th ed. 1983). Since Congress did not incorporate this knowledge requirement into section 547(c)(4), it is unlikely that it intended to produce a codification of the net result rule sought by Marathon.

Even if the Court were to look to the legislative history of section 547(c)(4), the Court would have to find Marathon's reliance thereon misplaced. Although the legislative history does indicate that the section was intended to be a codification of the net result rule, the legislative history of that section also refers to the formula stated in the section. The legislative history provides: "If the creditor and debtor have more than one exchange during the 90-day period, the exchanges are netted out according to the formula in paragraph (4)." S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 374, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6330. Paragraph four allows a creditor a setoff only when new value is given after a transfer. The legislative history itself is therefore in

---

**4.** The net result rule is not derived from section 60c of the Bankruptcy Act. Rather, it is a judicially created interpretation of that section, which provides:

> [W]hen, for goods sold and delivered, payments are made on a running or open account between the parties in the regular course of business within the 90-day period, without the knowledge on the part of the creditors of the debtor's insolvency, and the net result of these transactions is to enrich the debtor's estate by the total sales, less the total payments, such payments or transfers are not preferential, even though no corresponding goods are exchanged for the pay-

ments made within 90 days before bankruptcy.

4 Collier on Bankruptcy ¶ 547.40 (15th ed. 1983).

**5.** If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him.

Law of July 1, 1898, ch. 541, § 60(c), 30 Stat. 562, as amended (repealed 1979).

conflict, and the Court is persuaded that the clear language of the section must prevail.

Prior to the passage of the Bankruptcy Reform Act of 1978, Congress established a commission to study the bankruptcy laws and to recommend changes. That commission recommended: "A transfer is not avoidable to the extent of new value given at the time of the transfer or at any time thereafter. In determining the amount of new value given, the value of any security taken for it shall be deducted." Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess. pt. II, at 167 (1973). That commission expressly rejected the net result rule. *Id.* pt. I, at 223.

A committee of Congress made a similar recommendation:

If a transferee who did not give new value at the time of a transfer thereafter delivers goods to the debtor or makes further advances to him or otherwise gives new value, then, to the extent of the new value so given, the transfer is not voidable. In determining the amount of new value given the value of any security taken for it by the transferee shall be deducted.

Report of the Commission on Coordination of the Bankruptcy Act and the Uniform Commercial Code, National Bankruptcy Conference (1970), *appended to* H.R.Rep. No. 595, 95th Cong., 1st Sess. 204, 210 app., *reprinted in* 1978 U.S.Code Cong. & Ad. News 6164, 6169. The committee reports are substantially similar to the language of section 547(c)(4) and lend support to the Court's conclusion that Marathon's position must be rejected.

Collier on Bankruptcy explains section 547(c)(4) as follows:

To "the extent that" the transferee gives "new value to or for the benefit of the debtor" on an unsecured basis after receiving a preferential transfer, the preference will not to be avoidable. "In other words, even though a creditor has received a preference ..., he may still offset [against a preference claim] any subsequent unsecured credit which he ex-

tended to the debtor." The debt may be unsecured as an initial matter or may be secured by an avoidable security interest.

Section 547(c)(4) substantially restates former Section 60c of the prior law. Nevertheless, Section 547(c)(4) is not, as may be suggested, a codification of the so-called "net result" rule of prior law. 4 Collier on Bankruptcy ¶ 547.40[1] (15th ed. 1983) (citations omitted). In addition, Norton's treatise on bankruptcy law analyzes section 547(c)(4) as follows:

Code § 547(c)(4) has its most frequent application in revolving credit relationships. In this context, it is often confused with the so-called "net result rule," an analytical approach that considers all payments and extensions of credit received during the period applicable to preference law and permits recovery of only the net gain received by the creditor. This rule was applied in cases at the beginning of the 20th century, but is of doubtful current validity. In contrast to the "net result" test, *the subsequent advance rule protects preferential transfers only to the extent that subsequent advances are made.*

2 Norton Bankruptcy Law & Practice, pt. 32, p. 58 (1982) (emphasis added).

Case law has also followed the views expressed above. For example, in *In re Rustia,* 20 B.R. 131, 9 Bankr.Ct.Dec. 6, 6 Collier Bankr.Cas.2d 917 (Bkrtcy.S.D.N.Y.1982), the court addressed section 547(c)(4):

Under paragraph (4) new value must be given by the creditor "after such transfer." Thus, only preferential transfers made by the debtor before the new value was given may be netted out against the subsequent new value. However, preferential payments following receipt of new value are not netted against the new value. Thus, the net result rule does not apply to the 90 day preference period as a whole; each transfer must be examined independently to determine whether or not the creditor later replenished the estate.

*Id.* at 135, 9 Bankr.Ct.Dec. at 8, 6 Collier Bankr.Cas.2d at 921. See also *Waldschmidt*

*v. Ranier (In re Fulghum Construction Corp.)*, 706 F.2d 171 (6th Cir.1983) (net result rule no longer viable in light of Bankruptcy Code's subsequent advance rule); *Garland v. Union Electric Co. (In re Garland )*, 19 B.R. 920, 6 Collier Bankr.Cas.2d 1259 (Bkrtcy.E.D.Mo.1982) (section 547(c)(4) not a codification of net result rule); *Pettigrew v. Trust Company Bank (In re Bishop )*, 17 B.R. 180, 8 Bankr.Ct.Dec. 852, 5 Collier Bankr.Cas.2d 1515 (Bkrtcy.N.D.Ga. 1982) (net result rule not applicable under section 547(c)(4)).

Upon consideration of the above authority, the Court concludes that the payments sought to be avoided by the trustee do not fall within the exception found in section 547(c)(4). The last time that Marathon extended value to Craig was on August 27, 1981, when Craig picked up its last gas from Marathon's Macon terminal. All of the fourteen cashier's checks sought to be recovered by the trustee were received by Marathon *after* August 27, 1981. Therefore, the trustee may recover the $127,-098.90 in preferential payments made by Craig after August 27, 1981.[6]

The trustee requests that the Court render judgment against Marathon for $127,098.90, the amount of the payments (transfers) made after August 27, 1981. Section 550(a) of the Bankruptcy Code, 11 U.S.C.A. § 550 (West 1979), allows the trustee to recover from the initial transferee property transferred in a transfer avoided under section 547. Thus, the Court grants the trustee's request for a judgment.

The trustee also requests the Court to award to him interest and costs. The trustee asks for an award of interest from the

date of each avoidable transfer, and the Court has carefully considered the request. The Court is persuaded that such an award is not proper, but will award interest on the $127,098.90 at the legal rate from the date this adversary proceeding was commenced.[7] The interest will run until satisfaction of the Court's judgment. Costs will also be awarded to the trustee.

An order in accordance with this opinion is attached hereto.

---

**6.** In deciding this adversary proceeding, the Court has not applied section 547(c)(4) to any payments made to Marathon prior to the August 27, 1981 date because the pleadings and stipulations of the parties do not reach those payments.

**7.** 3 Collier on Bankruptcy ¶ 60.63[1] (14th ed. 1977) provides:

In a suit to avoid a preferential transfer, the trustee is entitled, of course, to recover interest as well as the property or, where it has been converted, its value. Interest

should ordinarily be allowed either from the time a demand was made upon the transferee for the return of the property transferred, or, in case no demand was made, from the date of the commencement of a suit to recover the same.

*See also* 4 Collier on Bankruptcy ¶ 550.02 n. 7 (15th ed. 1983) (¶ 60.63 of the 14th edition cited for the proposition that the Court should exercise its equitable power when awarding interest in preference cases).