**In re TULSA·LITHO COMPANY, Debtor.**

**Neal Tomlins, Plan Trustee for the Chapter 11 Bankruptcy Estate of Tulsa Litho Company, Plaintiff,**

v.

**BRW Paper Co., Inc., Defendant.**

**Bankruptcy No. 96–01814–M. Adversary No. 97–0378–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 3, 1998.

Neal Tomlins, Tulsa, OK, for Plaintiff.

Mark Stromberg, Dallas, TX, for Defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL,
Bankruptcy Judge.

THIS MATTER came before the Court for trial on June 12, 1998. Plaintiff Neal Tomlins, Plan Trustee for the Chapter 11 Bankruptcy Estate of Tulsa Litho Company ("Tomlins"), appeared personally and by and through his attorney, Ronald E. Goins. Defendant BRW Paper Co., Inc. ("BRW") appeared by and through its attorney, Mark Stromberg. The Court received evidence and heard argument from the parties. The Court also considered the facts stipulated to by the parties in the Pre–Trial Order filed in this action on April 8, 1998. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(F).

### Findings of Fact

This action arises out of a payment made by Tulsa Litho Company, the Chapter 11 Debtor herein ("Tulsa Litho" or "Debtor"), to BRW during the month of May, 1996. The parties to this litigation have stipulated to the following facts:

1. Tomlins was appointed under the "Second Amended Plan of Reorganization for Tulsa Litho Company, Debtor" (the "Plan") confirmed by this Court by Order dated November 26, 1996. Tomlins was appointed under the Plan to pursue avoidance actions.

2. Tulsa Litho is a corporation and was the debtor in Chapter 11 Case No. 96–01814–M (formerly 96–01814–W).

3. BRW was a creditor of Debtor.

4. Debtor transferred to BRW the sum of $18,893.55 by cashier's check dated on or about May 8, 1996 (the "Transfer").

5. The Transfer was made within 90 days of the date of Debtor's Petition for Relief under Chapter 11.

6. Debtor was insolvent at the time of the Transfer.

7. The Transfer enabled BRW to receive more than BRW would receive if the case were one under Chapter 7, the Transfer had not been made, and BRW received

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 1998).

payment pursuant to Chapter 7 on such debt.

8. Demand on BRW for return of the Transfer was made by Tomlins on March 24, 1997. *Docket No. 9, § 2.* BRW refused to return the Transfer to Tomlins, and this litigation followed.

In addition to the stipulated facts set forth above, the parties presented additional facts by way of exhibits and testimony. Tulsa Litho is a corporation engaged in the business of sheet-fed printing for commercial uses by businesses, organizations and individuals. Tulsa Litho uses mass quantities of paper in the ordinary course of its business. Paper is purchased from commercial suppliers, usually on open account. The schedules filed in this case indicate that, at the time the case was filed, Tulsa Litho had approximately $872,830.00 in general unsecured claims. Testimony adduced at the trial established that the vast majority of these claims were incurred by Tulsa Litho for the acquisition of paper.

The relationship between Tulsa Litho and BRW began in April of 1996, when Tulsa Litho was acquired by another corporation, Consolidated Graphics. At the time it was acquired, Tulsa Litho was in some financial difficulty, and had a negative net worth of $1.2 million. Tulsa Litho, seeking additional suppliers of paper, contacted BRW and requested an open line of credit for the purchase of paper supplies. Consolidated Graphics had been a significant customer of BRW for quite some time, and was able to purchase product from BRW on favorable terms.[2] Tulsa Litho submitted a credit application to BRW, providing little financial information, and listing the business references of Consolidated Graphics as its own. *Plaintiff's Exhibit 1.* On the strength of its affiliation with Consolidated Graphics, BRW extended an open line of credit to Tulsa Litho.

BRW made sales to Tulsa Litho as evidenced by the following nine invoices:

| Invoice No. | Date | Amount |
| --- | --- | --- |
| 60646 | 4/17/96 | $  756.00 |
| 60698 | 4/18/96 | 3,770.00 |
| 60790 | 4/23/96 | 7,052.43 |
| 60969 | 4/26/96 | 7,700.70 |
| 61112 | 5/01/96 | 1,446.64 |
| 61299 | 5/08/96 | 829.27 |
| 61493 | 5/13/96 | 1,193.40 |
| 61620 | 5/15/96 | 1,920.73 |
| 61524 | 5/15/96 | 9.71 |
| 61983 | 5/24/96 | 672.00 |

*Plaintiff's Exhibit 2.* All of the invoices except for Invoice No. 60698 contained "terms" of "1% 30, net 31" which indicated that Tulsa Litho would receive a 1% discount if the invoice were paid within 30 days, but that, in any event, the invoice was due 31 days after the date it was issued. Invoice No. 60698 contained terms of "2% 20, net 21", indicating a 2% discount if the invoice were paid within twenty days, and a due date of 21 days after the invoice date. Notwithstanding the terms contained in the invoices, credit was extended to Tulsa Litho on the same terms as were provided to Consolidated Graphics. Under those terms, all invoices were due on the 20th day of the month following their issuance, and all invoices timely paid were entitled to a 2% discount. Accordingly, all invoices issued during the month of April 1996, were due May 20, 1996; those that were issued in the month of May 1996 were due June 20, 1996.

On or about May 8, 1996, Tulsa Litho caused a cashier's check (the "Cashier's Check") in the amount of $18,893.55 to be issued in favor of BRW. The Cashier's Check contained a notation that it was in payment of Invoice Nos. 60646, 60790, 60869 and 60698. The amount of the Cashier's Check represented the total amount of these four invoices, less a two percent (2%) discount. The Cashier's Check was delivered to a lock box account for BRW physically located in Chicago,

---

**2.** BRW provided Consolidated Graphics with a twenty percent (20%) discount off of its regular prices.

Illinois, and was posted by BRW to the account of Tulsa Litho on May 20, 1996. All other invoices, with the exception of Invoice No. 61620, remain unpaid. Invoice No. 61620 was paid as an administrative claim under the terms of the confirmed plan of reorganization in this case. These nine invoices represent the only business transactions between BRW and Tulsa Litho.

During the period immediately prior to the filing of the Chapter 11 bankruptcy case (February 19, 1996, to May 8, 1996),[3] Tulsa Litho made 473 separate payments to creditors. In May of 1996, at the direction of Consolidated Graphics, Tulsa Litho obtained a total of $119,000.00 in nine separate cashier's checks. The cashier's checks were used to pay certain creditors of Tulsa Litho. Of those nine cashier's checks, five (including the Cashier's Check) were issued to paper suppliers of Tulsa Litho. *See Plaintiff's Exhibit 4.* The decision as to which creditors were to receive cashier's checks was made by the management of Tulsa Litho. No one from BRW had any part in the issuance of the Cashier's Check, nor was the same ever requested or required by BRW.

Bryan Barlow, one of the principals of BRW, testified regarding BRW's customary practices with respect to payments received. Mr. Barlow testified that, on average, BRW receives between 300 and 500 payments per day on its various open account customers. Those receipts come in the form of corporate checks, cashier's checks, money orders and cash, with the vast majority being corporate checks. Mr. Barlow also testified that BRW would not sell product to a financially distressed customer on open account, but instead would require such a customer to be on a "cash on delivery" basis. Mr. Barlow also testified that no one at BRW was ever made aware of any of the financial problems of Tulsa Litho, and that credit was extended to Tulsa Litho by BRW as a result of Tulsa Litho's affiliation with Consolidated Graphics. Upon learning of the Chapter 11 filing by Tulsa Litho, BRW immediately ceased selling product to Tulsa Litho on an open account basis.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### *Burden of Proof*

The burden of proof lies with the Trustee to establish each of the elements of a preference by a preponderance of the evidence. § 547(g); *In re Freeny,* 187 B.R. 711, 715 (Bankr.N.D.Okla.1995). Once the elements of a preference have been established, the burden of establishing an affirmative defense lies with BRW, which must establish the presence of such a defense by a preponderance of the evidence. *Id.; See also In re Meridith Hoffman Partners,* 12 F.3d 1549, 1553 (10th Cir.1993) *cert. denied,* 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994); *In re Sunset Sales, Inc.,* 220 B.R. 1005, 1018–1019 (10th Cir. BAP 1998).

### Conclusions of Law

*Elements of A Preference Action*

The elements of a preference action are spelled out in § 547(b) of the Bankruptcy Code.[4] The parties have stipulated

---

**3.** The Chapter 11 bankruptcy case of Tulsa Litho was filed on May 15, 1996. Notwithstanding this fact, the evidence submitted dealt with payments made by Tulsa Litho between February 18, 1996, and May 8, 1996.

**4.** Section 547(b) reads as follows:
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
　(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
　(A) on or within 90 days before the date of the filing of the petition; or
　(B) between ninety days and one year before the date of the filing of the peti-

to all of the elements except one; namely, whether the Cashier's Check was tendered to BRW by Tulsa Litho in payment of an antecedent debt. BRW argues that because the amounts owed to it were not past due, the debt at issue is not "antecedent." The Court disagrees.

In support of its position that a debt is not "owed" for purposes of § 547(b)(1) until it is past due, BRW relies upon *In re Brennan,* 187 B.R. 135 (Bankr.D.N.J.1995) (hereafter *"Brennan"*). In *Brennan,* the court ruled that a debt is not "owed" for purposes of § 547(b)(2) until it is past due. *Brennan* represents the minority opinion on the issue.[5] As the Bankruptcy Appellate Panel for the Second Circuit has noted:

> The case law is clear that for purposes of Section 547(b)(2) "an antecedent debt" is a pre-existing debt that was

---

tion, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
§ 547(b).

5. The Court in *Brennan* came to its conclusion without the benefit of any legal authority or argument from the parties to the litigation. As the court noted:

> A debt is generally held to be "antecedent" for purposes of Code section 547(b)(2) if it was incurred prior to the relevant transfer. *See e.g., In re Artha Mgmt., Inc.,* 174 B.R. 671, 678 (Bankr.S.D.N.Y.1994). The case law on section 547(b)(2) focuses primarily on whether the debt was "antecedent." [citations omitted]. To satisfy section 547(b)(2), however, a debt must be both "antecedent" and "owed by the debtor before such transfer was made." *Id.* Under general principles of statutory construction, courts are to attempt to give meaning to all statutory language and to avoid determinations which render any statutory language a nullity. [citations omitted]. Therefore, if possible the courts should construe the clause "owed by the debtor before such transfer was made" in section 547(b)(2) as adding some meaning to the prior words

---

incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt. The consideration may have been a loan or the furnishing of goods or services, but when the debtor obtained the loan, goods or services, the creditor had a claim, matured or unmatured, that it could then assert against the debtor's bankruptcy estate if payment was not made at the time a petition was filed. At that point the debt was "antecedent" for purposes of Section 547(b)(2). *See In re Cybermech, Inc.,* 13 F.3d 818 (4th Cir.1994); *In re Futoran,* 76 F.3d 265 (9th Cir.1996); *In re Energy Coop., Inc.,* 832 F.2d 997 (7th Cir.1987); *In re Gold Coast Seed Co.,* 751 F.2d 1118 (9th Cir.1985).

Furthermore, we believe that "owed by the debtor when the transfer was

---

"antecedent debt." That is, the courts should avoid construing 547(b)(2) as containing a redundancy. While research for this memorandum opinion did not disclose any case law expressly addressing this issue, the court concludes for the purposes of this opinion that a debt is not "owed" within the meaning of section 547(b)(2) until payment is past due, even if the debt is admittedly antecedent. This would be a particularly appropriate construction where, as here, the debtor presumably did not know the amount due for legal services and expenses until it received an invoice. *This holding is without prejudice, however, to the right of any party challenging the transfer to argue for a different conclusion of law in an adversary proceeding under Code section 547. None of the parties argued or briefed this issue in connection with these objections.*
*Brennan,* 187 B.R. at 153 (emphasis added).
It is interesting to note that *Brennan* does what it hoped to avoid; namely, it renders the "contemporaneous exchange" defense set forth in § 547(c)(3) a nullity. If a debt is not owed until it is past due, no transfer will be subject to attack as a preference unless the amount owed is past due, and the need for a "contemporaneous exchange" defense no longer exists. In effect, all credit sales on invoice will be "contemporaneous transfers," so long as the invoice is timely paid according to its terms. One is left to ponder as to whether the *Brennan* court ultimately held true to the theory espoused above.

made," simply requires that the Court determine that at the time of the transfer there was a recognizable "claim" that was: (1) against the debtor, rather than only against a third party; and (2) that was pre-existing, rather than one which arose simultaneously with the transfer. *See In re Western World Funding, Inc.,* 54 B.R. 470, 478 and *In re Virginia–Carolina Fin. Corp.,* 954 F.2d 193, 197. *In re The Bennett Funding Group, Inc.,* 220 B.R. 739, 742 (2nd Cir. BAP 1998); *see also In re Southmark Corp.,* 62 F.3d 104, 106 (5th Cir.1995) ("A debt is antecedent under § 547(b) if the debtor incurs it before making the preferential transfer.").

In the present case, BRW shipped paper products to Tulsa Litho on an open line of credit. Under the terms of the credit agreement between the parties, payment of that invoice was due on the 20th day of the month following the month in which product was delivered. The Court finds that the amounts owed to BRW by Tulsa Litho at the time of delivery of the Cashier's Check constituted "antecedent debt" for purposes of § 547(b)(2) of the Bankruptcy Code. Accordingly, all elements of a preference are present in this case. The Court must next consider whether any of the exceptions set forth in § 547(c) apply.

*The "Ordinary Course of Business" Defense*

BRW argues that, assuming the elements of a preferential transfer are present in this case, the issuance of the Cashier's Check constitutes a payment in the ordinary course of business between BRW and Tulsa Litho which falls within the following statutory exception:

(c) The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

§ 547(c)(2). As noted above, BRW has the burden of proof with respect to each element of this defense. *See* § 547(g). The purpose of the "ordinary course" defense to a preferential transfer has been explained by our Court of Appeals:

The purpose of the ordinary course exception is "to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), 1978 U.S.C.C.A.N. 5787, 5874. The preference section does not discourage "unusual action" simply because others in the industry wouldn't respond to similar circumstances in the same way. It discourages "unusual action" that may favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out.

*In re Meridith Hoffman Partners, supra,* 12 F.3d at 1553 (citations omitted); *accord, In re Hedged–Investments Associates, Inc.,* 48 F.3d 470, 475 (10th Cir.1995).

The evidence establishes that the debt at issue was incurred in the ordinary course of business of Tulsa Litho and BRW. Tulsa Litho, as part of its ordinary business operations, purchased paper on open account from several suppliers, including BRW. BRW sold paper on open account in the ordinary course of its business to numerous companies, including Tulsa Litho. Neither party argued that the debt at issue was incurred outside the ordinary course of business of either party. As a result, the first element of the "ordinary course" exception has been satisfied.

■ Guidance with respect to the second and third elements of the "ordinary course" exception comes from the Bankruptcy Appellate Panel for this Circuit:

Subsection (B) of this section creates a subjective test, i.e., whether the transfers were ordinary as between the parties, and subsection (C) creates an objective test, i.e., whether the transfers were ordinary in the industry. Findings under these subsections are generally considered factual and are, therefore, subject to the clearly erroneous standard of review.

Courts consider four primary factors to determine if payments are ordinary between the parties as required under the subjective test set forth in subsection (B): (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made. These factors are typically considered by comparing pre-preference period transfers with preference period transfers. *In the absence of any prior transactions, courts, typically look to see if the debtor complied with the payment terms of its contract.* Late payments are typically not "ordinary," unless the creditor establishes that a pattern of late payments was ordinary between the parties. In interpreting the objective test under subsection (C), the Tenth Circuit has held that "ordinary business terms" are terms used in " 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy."

*In re Sunset Sales, Inc.,* 220 B.R. 1005, 1020–1021 (10th Cir. BAP 1998) (hereafter *"Sunset Sales"*) (footnote and citations omitted) (emphasis added). In order for a transaction to be in the ordinary course of business, it must pass muster under both the subjective and objective tests.

*The Subjective Test*

■ As noted in *Sunset Sales,* where a debtor and creditor have engaged in no prior transactions, the Court should look to see if "the debtor complied with the payment terms of its contract." *Id.* In the present case, the transactions at issue between Tulsa Litho and BRW were the first transactions between the two companies.[6] Under the terms of the credit arrangement between BRW and Tulsa Litho, Tulsa Litho was to pay all outstanding invoices by the 20th day of the month following the issuance of the invoice.[7] That is exactly what happened. Accordingly, the subjective test has been met.

Tomlins argued three factual points in support of his position that the payment by Tulsa Litho to BRW was not in the

---

6. Some courts have held that the "ordinary course of business" exception can never be applied to the first transaction between debtor and creditor, since there is no prior course of dealings from which the subjective "ordinary course" can be determined. *See, e.g., In re Brown Transport Truckload, Inc.,* 152 B.R. 690, 692 (Bankr.N.D.Ga.1992). Other courts have held to the contrary. *See In re Finn,* 909 F.2d 903, 908 (6th Cir.1990); *In re Decor Noel Corp.,* 134 B.R. 868, 873 (W.D.Tenn. 1991). Strong dicta contained in *Sunset Sales* would indicate that the Bankruptcy Appellate Panel for this circuit is in agreement with the latter position. *See Sunset Sales,* 220 B.R. at 1021. Taking the "ordinary course of business" defense away from an entity who does business with a debtor for the first time during the debtor's "slide into bankruptcy" does nothing to promote Congress' intent behind the "ordinary course of business" defense; namely, to encourage entities to do business with the financially troubled debtor. *Id.* This Court believes that the better reasoned position does not eliminate the "ordinary course of business" defense when the transaction at issue is the first transaction between debtor and creditor.

7. Based upon the evidence presented at Trial, the Court made a factual finding that the actual credit terms between the parties are other than those reflected on the invoices. *See* pp. 243–244 *supra.*

"ordinary course of business": (1) the fact that Tulsa Litho was in financial difficulty when it paid BRW; (2) the fact that the Cashier's Check, and not some other form of payment, was issued to BRW; and (3) the fact that the amounts represented by the Cashier's Check did not equal the amounts due under the terms of the invoices. The Court believes that each of these arguments relate to the "subjective test" discussed in *Sunset Sales,* and will examine each in turn.

### Tulsa Litho's Financial Difficulty

It is undisputed that Tulsa Litho was facing financial difficulties when it entered into a business relationship with BRW and arranged for the delivery of product and extension of credit terms at issue here. BRW was unaware of the financial difficulties of Tulsa Litho. At the time Tulsa Litho paid BRW, it did not pay certain of its other creditors. Virtually every Chapter 11 debtor is in financial difficulty during the 90 days prior to the filing of the bankruptcy case. Virtually every Chapter 11 debtor does not pay all of its creditors in the 90 days prior to the filing of the bankruptcy case. If these two factors, taken alone, are enough to defeat the "ordinary course of business" defense, then the defense does not exist, and § 547(c) is of no force and effect. Congress did not intend such a result. The issue here is not whether BRW received a preference; it did. The issue is whether the Bankruptcy Code permits the trustee to recover the preference.

It is also important to note that even though Tulsa Litho was in financial difficulty during this period, it did continue to pay some of its creditors. The evidence presented by Tomlins established that during the ninety day period prior to the filing of the bankruptcy case, Tulsa Litho made 473 separate payments to creditors, including the payment to BRW represented by the Cashier's Check. The Court finds that, even as Tulsa Litho began its "slide into bankruptcy," paying its creditors was part of the ordinary course of its business.

### Issuance of the Cashier's Check

The issuance of the Cashier's Check is more troubling for the Court. Indeed, it appears that the primary factor which could take this transaction outside of the "ordinary course of business" is the fact that Tulsa Litho unilaterally chose to pay BRW through issuance of the Cashier's Check, rather than by an ordinary corporate check. The question is whether this fact, standing alone is sufficient to take the transaction at issue outside the "ordinary course of business" exception. A representative of Tulsa Litho testified that the Cashier's Check was issued for the purpose of "taking care of" certain creditors of Tulsa Litho. It appears that Tulsa Litho issued the Cashier's Check to BRW in hopes that BRW would continue to offer unsecured credit to Tulsa Litho after its bankruptcy case was filed. Notwithstanding the intentions of Tulsa Litho, BRW did not play any part in the issuance of the Cashier's Check, and often received such cashier's checks in payment of outstanding invoices.

As the Trustee points out, there are reported decisions where courts have found that a payment by cashier's check constituted a payment outside of the ordinary course of the debtor's business. *See In re Craig Oil Company,* 31 B.R. 402 (Bankr.M.D.Ga.1983) (hereafter *"Craig Oil"*), *aff'd, Marathon Oil Co. v. Flatau,* No. 83–307–1–MAC (M.D.Ga. April 17, 1985), *aff'd,* 785 F.2d 1563 (11th Cir.1986); *see also In re Everlock Fastening Systems, Inc.,* 171 B.R. 251 (Bankr.E.D.Mich. 1994) (hereafter *"Everlock"*). However, in those cases, factors other than the issuance of the cashier's check played a significant role in the decision. In *Craig Oil,* the debtor was delinquent in its payments and over its credit limit. The use of cashier's checks came after the creditor had requested the same, and after a third party had requested that the creditor join in an involuntary petition against *Craig Oil.* 31 B.R. at 404. Indeed, the court in *Craig Oil* noted that payment by cashier's check,

standing alone, was not sufficient to defeat the "ordinary course of business" defense:

> The Court does not find that payment by certified or cashier's check is outside the ordinary course of business practice in and of itself. Rather, in the context of the circumstances of this case, the Court finds that Craig's payments to Marathon by cashier's checks were made neither in the ordinary course of Marathon's business or Craig's business nor according to their ordinary business terms.

31 B.R. at 406. On appeal, the circuit court did not take issue with this reasoning, noting that a combination of factors (request by the creditor for a showing of "good faith," desire of the debtor to keep the creditor from joining in an involuntary bankruptcy petition against the debtor and personal guaranties of the debtor's principals) led to the conclusion that the transfers at issue were outside the "ordinary course of business." 785 F.2d at 1566. In *Craig Oil,* the court focused heavily on the fact that the conduct of the creditor played a major role in the issuance of the cashier's check. In the present case, there is no such conduct by BRW.

The *Craig Oil* decision by the circuit court is helpful in another area as well. The following language is quite instructive.

> As several courts have noted, this exception [§ 547(c)] is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle. Because the credit is meant to be extremely short-term, Congress likened payment of trade credit to the payment of current expenses. Recognizing that the latter had traditionally been protected from avoidance in bankruptcy, Congress extended the same protection to trade credit through the ordinary course of business exception. Since the founda-

tion of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is "kept current" or other transactions which are paid in full within the initial billing cycle.

*Craig Oil,* 785 F.2d at 1567 (footnotes omitted) (citations omitted).[8] The transaction between Tulsa Litho and BRW is an ordinary trade credit transaction, Tulsa Litho requested an open line of credit from BRW. BRW agreed to provide the same, so long as Tulsa Litho paid its outstanding invoices by the 20th day of the month following their issuance. Tulsa Litho did just that. The only aspect of the transaction which could in any way be considered unusual is the fact that Tulsa Litho chose to make payment using the Cashier's Check. It was not unusual for BRW or any other paper vendor to be paid with a cashier's check. Payments in this form were received on a daily basis. The Court finds that payment by cashier's check, standing alone, is not enough to defeat the "ordinary course of business" defense. This ruling is necessarily limited to the facts of this case.

The other case cited by the Trustee also is factually dissimilar from the case at bar. In *Everlock,* the debtor issued a cashier's check for past due insurance premiums only hours before the bankruptcy petition was filed. 171 B.R. at 253. Although debtor and creditor had a history in which debtor had made 144 separate payments to the creditor, only the payment at issue was made by cashier's check. *Id.* at 254. As the court noted:

> In this case, Everlock paid for all six groups with a cashier's check just hours before the bankruptcy. Only on October 19, 1990 did Everlock pay for all six groups on one day. Only on October 19, 1990 did Everlock pay for all six groups with one check. And, only on October 19, 1990 did Everlock pay for any of the

---

**8.** Notwithstanding the foregoing quotation, this Court does not reach the issue of whether a late payment may fall within the "ordinary course of business" defense, as that issue is not raised by the facts herein.

groups with a cashiers check. During the usual course of business between Everlock and HAP, HAP was paid by ordinary checks drawn on Everlock checking accounts. Furthermore, Everlock paid HAP nineteen days late and HAP has made no showing that 19 days was an "ordinary" degree of tardiness in its business relations with Everlock. Indeed, the undisputed facts show that of the 198 payments made from January 1, 1988 to October 19, 1992, only 31 (fewer than 16%) were 19 or more days late. Therefore, by evaluating the totality of the circumstances, this Court finds that Everlock's payment to HAP was not in the ordinary course of business, and therefore, HAP cannot rely on § 547(c)(2) as an affirmative defense to Everlock's motion for recovery of the payment.

*Id.* (footnotes omitted). In both *Everlock* and *Craig Oil,* there are significant factors *other* than the use of cashier's checks by the debtor which cause the transactions at issue to fall outside the "ordinary course of business." It appears likely to this Court that the transactions in those cases would not have qualified for the "ordinary course of business" exception in any event, regardless of the issuance of cashier's checks. Neither the briefs submitted by the parties nor the Court's own research uncovered a single case in which the use of a cashier's check, without the presence of other factors, caused a transaction to be outside of the "ordinary course of business" of a debtor.

### Variance Between Invoice Terms and Actual Payment

■ At trial, Tomlins argued that because the timing and amount of the Cashier's Check was not in exact conformity with the terms specified on each invoice, the issuance of the Cashier's Check was not in the "ordinary course of business" between Tulsa Litho and BRW. The Court rejects this argument. It is the dealings between the parties, and not necessarily the terms of the invoices, that establish the course of business between them. *See In re Morren Meat and Poultry Company, Inc.,* 92 B.R. 737, 740 (W.D.Mich.1988) (parties' actual conduct may modify contractual terms); *see also In re Matters,* 99 B.R. 314, 316 (Bankr. W.D.Va.1989) (regularly tendered late payments in "ordinary course of business"); *In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989) (same); *In re A.W. & Associates, Inc.,* 196 B.R. 900 (Bankr.N.D.Fla. 1996) (court found that parties by agreement varied payment terms from those found on invoices). The evidence is uncontroverted that BRW extended credit to Tulsa Litho on the same terms that it extended to all affiliates of Consolidated Graphics, and that it did so notwithstanding the terms on the invoices. Tulsa Litho paid BRW in accordance with the credit terms extended to it, and, as a result, paid in the ordinary course of the business and financial affairs of both Tulsa Litho and BRW.

### The Objective Test

■ Under the "objective test" of § 547(c), this Court is to look at the transfers at issue to determine if they "were ordinary in the industry." *Sunset Sales,* 220 B.R. at 1020 (citation omitted). The Court of Appeals for this circuit has held that "[o]rdinary business terms therefore are those used in 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy." *In re Meridith Hoffman Partners, supra,* 12 F.3d at 1553. The Court is to take a broad view of the concept of "ordinary business terms":

We conclude that "ordinary business terms" refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be

deemed extraordinary and therefore outside the scope of subsection C [of § 547 of the Bankruptcy Code].

*In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). When applied to the present case, this factor raises two questions: (1) is it "ordinary" for a supplier of paper products to establish credit terms with a customer, and then bill and collect in accordance with those terms; and (2) is it "ordinary" for a customer to pay for product through the issuance of a cashier's check. The Court answers both of these questions in the affirmative.

With respect to the ordinary business terms in the paper supply industry, the Court heard the testimony of Mr. Barlow. Barlow testified that he was familiar with the billing and credit standards used at BRW, and, as the paper supply industry is quite competitive, with those of other competitors as well. Barlow testified that the ordinary practice in the paper supply business is to provide credit on 30 day terms, and that the credit terms extended to Tulsa Litho by BRW were in accordance with credit terms extended by BRW to all affiliates of Consolidated Graphics. Barlow further testified that these credit terms were ordinary in the industry, and that a financially troubled purchaser would be placed on a "cash on delivery" basis by BRW. Tomlins offered no testimony to rebut the position taken by BRW that the credit terms which it offered were within industry standards. The payment from Tulsa Litho to BRW was made in accordance with these credit terms.[9] Barlow also testified that it was not unusual for a customer to pay by cashier's check, although such payments represented a small percentage of the payments received on a daily basis. The Court therefore concludes that the third prong of the "ordinary course of business" test has been satisfied. Tomlins is not entitled to recover the sums represented by the Cashier's Check from BRW.

*Section 547(c)(4) Defense*

BRW has also raised the "new value" defense provided for in § 547(c)(4) of the Bankruptcy Code.[10] Having determined that the payment from Tulsa Litho to BRW is not subject to avoidance as a preference under § 547(c)(2) of the Bankruptcy Code, the Court reaches none of the issues raised by BRW under § 547(c)(4).

### Conclusion

The Court believes this to be a case of factual first impression. The Court is convinced that, but for the issuance of the Cashier's Check, this action would never have been brought. The Court is further convinced that, based upon the record before it, BRW had nothing to do with the issuance of the Cashier's Check, and at no time placed any pressure for collection on Tulsa Litho. BRW delivered goods to Tulsa Litho, which Tulsa Litho paid for in accordance with the credit terms agreed to between the parties and on a timely basis. For whatever reason, Tulsa Litho chose to issue the Cashier's Check. The Court is left to decide whether this fact, and this fact alone, is sufficient to require BRW to return the funds paid to it. Under the

---

9. With respect to the issuance of the Cashier's Check by Tulsa Litho, the Court believes its analysis with respect to § 547(b)(2)(B) is applicable here as well.

10. Section 547(c)(4) reads as follows:
(c) The trustee may not avoid under this section a transfer—
. . .
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;
§ 547(c)(4).

circumstances, to so require would defeat the very purpose for which the "ordinary course of business" exception exists: to encourage entities to do business on an arm's length basis with a company in financial distress.

A separate judgment is entered concurrent with this memorandum opinion.

## JUDGMENT

THIS MATTER came before the Court for trial on June 12, 1998. Plaintiff Neal Tomlins, Plan Trustee for the Chapter 11 Bankruptcy Estate of Tulsa Litho Company ("Tomlins"), appeared personally and by and through his attorney, Ronald E. Goins. Defendant BRW Paper Co., Inc. ("BRW") appeared by and through its attorney, Mark Stromberg. The Court received evidence and heard argument from the parties. The Court also considered the facts stipulated to by the parties in the Pre–Trial Order filed in this action on April 8, 1998.

The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS THEREFORE ORDERED that the Complaint to Avoid and Recover Preferential Transfer filed by Neal Tomlins, Plan Trustee, on November 19, 1997, be, and the same hereby is, dismissed with prejudice.